**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ROBERT DANIELS,

                        Plaintiff,                9:23-cv-983 (BKS/TWD)

v.

PRITI MANDALAYWALA,

                        Defendant.

**Appearances:**

*For Plaintiff*:
Amy Jane Agnew
Joshua L. Morrison
Law Office of Amy Jane Agnew, P.C.
24 Fifth Avenue, Suite 1701
New York, New York 10011

*For Defendant*:
Oriana L. Kiley
Gabriella R. Levine
Whiteman Osterman & Hanna LLP
One Commerce Plaza
Albany, New York 12260

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

On August 12, 2023, Plaintiff Robert Daniels initiated this action pursuant to 42 U.S.C.

§ 1983 against Defendants Priti Mandalaywala and Kimberly Clark, alleging a claim for

deliberate indifference under the Eighth Amendment. (Dkt. No. 1.) Plaintiff subsequently moved

before the United States Judicial Panel on Multidistrict Litigation ("MDL Panel") for transfer of

the action, along with numerous other actions filed by Plaintiff's counsel, under 28 U.S.C.

§ 1407 for coordinated or consolidated pretrial proceedings. (Dkt. No. 4.) On November 16, 2023, Plaintiff filed the operative amended complaint, adding Defendant Carol Moores. (Dkt. No. 12.)[1] On December 7, 2023, the MDL Panel denied Plaintiff's § 1407 motion. *In re N.Y. Dep't of Corr. & Cmty. Supervision Medications With Abuse Potential Prisoner Litig.*, No. MDL 3086, --- F. Supp. 3d ----, 2023 WL 8539909, at *3, 2023 U.S. Dist. LEXIS 219565, at *5 (J.P.M.L. Dec. 7, 2023).

Presently before the Court is Defendant Mandalaywala's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 26.) The motion is fully briefed. (Dkt. Nos. 28–29, 31.) For the following reasons, Defendant's motion to dismiss is denied.

## II.    FACTS[2]

### A.    Medications With Abuse Potential Policy

Plaintiff, who was held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") from 2019 to 2022, alleges that Defendant Mandalaywala's continued refusal to represcribe Gabapentin and Tylenol #3 to treat Plaintiff's chronic pain, due to DOCCS policies and customs, constitutes deliberate indifference. (Dkt. No. 12, at 53, ¶ 334–39.) DOCCS' "policy on Medications With Abuse Potential" ("MWAP") was promulgated on June 2, 2017. (*Id.* ¶¶ 11, 143–44.)[3] On its MWAP list, "DOCCS included a group of . . . ubiquitous medications, including" medications at issue here: Neurontin (also known as Gabapentin), "an anticonvulsant generally taken to control seizures" and "often

---

[1] Plaintiff later voluntarily dismissed Defendant Moores, (Dkt. No. 27), and stipulated to the dismissal of Defendant Clark, (Dkt. No. 30), leaving only Defendant Mandalaywala.

[2] These facts are drawn from the amended complaint. (Dkt. No. 12.) The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] The MWAP policy is codified as DOCCS Health Services Policy 1.24, "Medications with Abuse Potential."

prescribed to relieve nerve pain"; Percocet, a combination of oxycodone and acetaminophen used to treat moderate to severe pain; and Tylenol #3, which is used to treat mild to moderate pain and contains Codeine, an opioid pain reliever. (*Id.* ¶¶ 76, 86–87, 90.)[4] The medications on the MWAP list "are not risk free," and "[l]ike any medication they can be abused, but many of them—including Neurontin . . . —are considered to have low addiction potential." (*Id.* ¶ 96–97.) "DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades." (*Id.* ¶ 98.)

Under the MWAP policy, a provider must "submit an MWAP Request Form" to a Regional Medical Director ("RMD"). (*Id.* ¶ 156–157.) The MWAP Request Form "asked for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue." (*Id.* ¶ 158.) The MWAP Request Form "also asked if there is any recent evidence of drug diversion or abuse by the patient." (*Id.* ¶ 159.) "Based on the MWAP Request Form contents—the RMD and not the patient's medical provider—determined whether a patient will receive an MWAP." (*Id.* ¶ 162.) The treating physicians and mid-level clinical physicians "had to discontinue an MWAP prescription if it was not approved by the RMD"; "[p]harmacies would not fill a prescription for an MWAP without RMD approval"; and the providers "had no ability to provide the medication once an RMD refused to approve the prescription." (*Id.* ¶ 167.)

The MWAP policy "had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs." (*Id.* ¶ 173.) "As implemented, the MWAP Policy was an almost wholesale restriction on the prescription of MWAPs, except in cases of acute need

---

[4] Although Plaintiff appears to allege that Gabapentin was in a 2019 Formulary Book and was therefore available to doctors to prescribe without approval from an administrator, (*id.* ¶¶ 34–35, 37), Plaintiff's allegations as to the Medications With Abuse Potential policy and related customs suggest that the MWAP policy altered these practices.

or palliative care." (*Id.* ¶ 105.) This stands in contravention of the positions of several other agencies, such as the National Commission on Correctional Health Care, of which DOCCS is an accredited member, who published a position indicating that "[c]linicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain)[;] [r]ather clinicians should consider all aspects of the problem and all available proven modalities," and "[p]olicies banning opioids should be eschewed." (*Id.* ¶¶ 108–09.) Similarly, the Federal Bureau of Prisons' ("BOP") Clinical Guideline does not prohibit use of opioids or neuromodulating medications like Neurontin but instead "lists Neurontin . . . as [a] second line treatment[] for neuropathic pain." (*Id.* ¶¶ 110–11.) The American Correctional Association, by which DOCCS is accredited, "lists the BOP Clinical Guideline . . . as its clinical guideline standard." (*Id.* ¶ 112.) The New York State Department of Health "has only two main concerns regarding Neurontin/Gabapentin: it recommended avoiding prescriptions in doses higher than 3600 mg per day because there is no evidence of increase in therapeutic dose, and it recommended avoidance of use of Neurontin by a patient benefiting from concurrent opioid treatment." (*Id.* ¶ 113.) The American Medical Association "also does not restrict the prescription of many of the medications on the MWAP list." (*Id.* ¶ 114.) In fact, "[t]he standard in the medical community is to use medications like Neurontin . . . and other non-opioid MWAPS to treat chronic conditions to reduce the number of opioid prescriptions"; "[t]he standard in the medical community is not to restrict all effective treatment." (*Id.* ¶ 116.)

In February 2021, "as a direct result of class action litigation, DOCCS . . . rescinded the MWAP Policy and promulgated a new policy[,] 1.24A," entitled "Prescribing for Chronic Pain." (*Id.* ¶ 285.) "The new policy demanded 'Pain management medication should only be discontinued after a provider has met with the patient, discussed the issues regarding the use of

the medication, analyzed the patient's situation, and subsequently determined that it is in the best interest of the patient for the medication to be discontinued." (*Id.* ¶ 286.)

### B.   Plaintiff's Medical Issues

Plaintiff is a 49-year-old man who suffers from "obesity, Type II diabetes[,] diabetic neuropathy," and cervical spine syndrome, which result in a "chronic pain condition," and throughout the relevant period, Plaintiff experienced, inter alia, chronic neuropathic pain. (*Id.* ¶¶ 313, 319–20, 328, 332, 335, 337–38, 340–42, 346–47.) Plaintiff's "chronic pain symptoms are well documented, obvious, and confirmed" and "require[] effective pain management and medication to control." (*Id.* ¶ 313.)

Prior to Plaintiff's incarceration with DOCCS, he was a pretrial detainee at "New York City jail on Rikers Island." (*Id.* ¶ 314.) While at Rikers, Plaintiff was "continually prescribed and represcribed Gabapentin and Tylenol #3 to treat and manage his chronic pain," and Plaintiff's medical records from Rikers "note that he suffers from a lot of medical problems and he is in a lot of pain and needs medication to help manage his pain." (*Id.* ¶¶ 315–16.) "The medication of Gabapentin and Tylenol #3 was effective in managing [Plaintiff's] pain." (*Id.* ¶ 317.)

In October 2019, Plaintiff was transferred to the custody of DOCCS at Downstate Correctional Facility. (*Id.* ¶ 318.) "When a patient is first 'drafted in' to DOCCS he/she generally resides at a reception facility until staff conducts a medical assessment . . . ." (*Id.* ¶ 68.) The medical staff at a reception facility maintain a patient on all the medications and prescriptions they were taking before being "drafted in" to ensure continuity of care. (*Id.* ¶ 69.) "The medical staff at the reception facility conduct a thorough individualized assessment of the patient's health issues for use by practitioners in receiving facilities, and their findings related to major disease or mobility issues are entered into the patient's Medical Problem List." (*Id.* ¶ 70.) Upon transfer to a facility for housing, "a nurse is supposed to conduct an 'assessment[]' of the patient," and if a

"prisoner needs medications prescribed, a medical provider is given the medication list to review for ordering." (*Id.* ¶ 71.)

Upon arrival at Downstate, Plaintiff "had a broken right wrist and was in a cast," his "Health Transfer Information Form reported numerous medical problems, including a crushing injury to his right forearm, polyneuropathy, lower back pain and ankle pain," and his "medication on arrival was listed as Gabapentin and Tylenol Codeine #3." (*Id.* ¶¶ 319–20.) "DOCCS medical providers at Downstate coded [Plaintiff's] medical problems as pain, neuropathy, cervical spine syndrome and back pain with radiating symptoms." (*Id.* ¶ 320.) When Plaintiff arrived at Downstate, a doctor who performed a physical exam on Plaintiff "indicated that [Plaintiff] was morbidly obese, had an abnormal spine, extremities, abdomen, and skin." (*Id.* ¶ 321.) At Downstate, Plaintiff's Gabapentin prescription was continued, he was assigned to the infirmary, and the doctor ordered that Plaintiff be prescribed Tylenol #3 as needed for his pain management needs." (*Id.* ¶¶ 322–23.) "While in the Downstate infirmary, when [Plaintiff] complained of increased pain and requested Tylenol #3 it was provided to him." (*Id.* ¶ 323.) Plaintiff's "medical records indicate that his pain medication regime provided him 'good results' with 'reported relief.'" (*Id.*)

On October 28, 2019, one day before Plaintiff was transferred from Downstate to Franklin Correctional Facility, a nurse at Downstate "noted that she called Franklin medical department and gave a report on [Plaintiff], including going over his medication prescriptions." (*Id.* ¶ 324.) On October 29, 2019, DOCCS transferred Plaintiff to Franklin. (*Id.* ¶ 325.) Plaintiff's "indraft documents from Downstate listed his chronic ailments and his current prescriptions of Gabapentin and Tylenol #3." (*Id.* ¶ 326.) "However, immediately on his arrival at Franklin, and without first seeing his medical provider for an assessment, [Plaintiff's] Gabapentin and Tylenol

#3 prescription was discontinued by an indraft nurse." (*Id.* ¶ 327.) The nurse "immediately noted on [Plaintiff's] list of medications that his Gabapentin and Tylenol #3 prescriptions were discontinued, without any medical reasoning, assessment, or justification noted." (*Id.*)

Plaintiff was immediately placed in the Franklin infirmary when he arrived, and Plaintiff complained to the nurse of "bilateral leg pain and weakness and radiating pain at a scale of 10 of 10." (*Id.* ¶ 328.) The nurse provided Plaintiff with ibuprofen for his pain. (*Id.* ¶ 329.) Plaintiff "immediately informed [her] that ibuprofen was not effective in treating his pain and asked [her] to provide him with his Tylenol #3 and Gabapentin prescriptions that had been effectively managing his chronic pain for years." (*Id.* ¶ 330.) The nurse, "despite already marking that those medications as discontinued, informed [Plaintiff] that those prescriptions would need to be ordered by a doctor in the morning." (*Id.* ¶ 331.)

On October 30, 2019, "without his effective medication, and his increased pain complaints concerning his diabetic neuropathy, a wheelchair was ordered for [Plaintiff] by his medical provider Defendant Priti Mandalaywala, MD." (*Id.* ¶ 332.) Defendant "was aware that [Plaintiff] had been treated with Gabapentin and Tylenol #3 to manage his pain, knew that they were discontinued when he arrived at Franklin, knew that Gabapentin and Tylenol #3 were effective[] treatments for [Plaintiff] for years, and knew that [Plaintiff] was obviously suffering uncontrolled pain from the discontinuation of those prescription medications," but Defendant "ignored [Plaintiff's] suffering and refused to represcribe him his effective medication." (*Id.* ¶ 333.) Instead, Defendant prescribed Plaintiff "ineffective medications such as ibuprofen and Lamictal for his neuropathic and chronic pain condition, despite the fact she knew that Gabapentin and Tylenol #3 were effective treatment." (*Id.* ¶ 334.)

7

In November 2019, Plaintiff "continued to complain to medical staff of chronic pain and requested an appointment with his doctor." (*Id.* ¶ 335.) On December 4, 2019, "still experiencing pain in his wrist, an x-ray was performed that found a marked widening of the scapholunate interval indicating injury to the scapholunate ligament" and "[a]n x-ray of [Plaintiff's] right knee showed degenerative joint disease." (*Id.* ¶ 336.) Despite these findings, Defendant "provided no effective adjustments to [Plaintiff's] pain medication," and Plaintiff "continued to suffer as a result." (*Id.*) On December 5, 2019, Plaintiff "fell out of his wheelchair and was seen for pain and swelling in his right hand, left leg, left ankle, and left foot pain and swelling." (*Id.* ¶ 337.) Plaintiff "continued to report uncontrolled neuropathic pain in his feet." (*Id.*) "However, despite his suffering and requests for Gabapentin, Defendant [] refused to represcribe him the knowingly effective medication." (*Id.*)

In "late December of 2019," Plaintiff "continued to attend physical therapy sessions to evaluate his need for a wheelchair as a result of the uncontrolled diabetic neuropathic pain in his feet," and Plaintiff "fell numerous times due to his uncontrolled pain conditions in his feet." (*Id.* ¶ 338.) Plaintiff's physical therapist recommended his continued use of a wheelchair. (*Id.*) On December 27, 2019, Plaintiff "was seen by an orthopedic hand specialist . . . to evaluate his hand," and "[f]ollowing [the doctor's] assessment and evaluation of [Plaintiff], she noted that he was in much more pain than expected to be in four months after his wrist injury." (*Id.* ¶ 339.) The doctor found that Plaintiff "had been suffering the whole time from a complete tear of a right wrist ligament and recommended complete reconstruction of his scapholunate ligament to prevent an advanced collapse of the ligament down the road." (*Id.*) "Throughout this time, [Plaintiff] continued to suffer from his diabetic neuropathy and severe pain in his feet," he "continued to inform [Defendant] and other staff of uncontrolled neuropathic pain[,] and he

requested Gabapentin, which effectively treated his feet pain for years." (*Id.* ¶ 340.) Defendant "continued to ignore his pleas for effective treatment and failed to individually assess [Plaintiff] for his medical needs." (*Id.*) "As a result, [Plaintiff] continued to needlessly suffer from uncontrolled neuropathic pain and ineffective treatment." (*Id.*)

In September 2020, Plaintiff "again reported to medical staff that both his feet were swelling, and he had pins and needles sensation when he walked and he requested to see his medical provider as soon as possible." (*Id.* ¶ 341.) In response to his complaints of increased diabetic neuropathic pain, Plaintiff "was told to continue taking the ineffective over-the-counter medication and to elevate his legs." (*Id.*) By "the end of September of 2020," Plaintiff "had been trying to see his medical provider for months through the sick call process, but an appointment was never scheduled." (*Id.* ¶ 342.) "As a result of the failure to provide any treatment or necessary care to [Plaintiff], his neuropathic pain in his feet had become so intolerable that he could not attend an EMG test study because of his pain." (*Id.*)

On September 30, 2020, Defendant "prescribed Elavil to attempt to treat [Plaintiff's] neuropathic pain." (*Id.* ¶ 343.) "A few days later, [Plaintiff] experienced significant side effects from the prescription and it was discontinued." (*Id.*) Defendant "did not prescribe alternative medication; she only placed [Plaintiff] back on acetaminophen." (*Id.* ¶ 344.) "At this time, Defendant [] remained aware that [Plaintiff's] neuropathic pain had been controlled with Gabapentin for years before she discontinued it"; however, Defendant "continued to refuse a prescription of the medication." (*Id.* ¶ 345.) As a result, Plaintiff "remained in such severe uncontrolled neuropathic pain that he could not go to his outside specialist appointments." (*Id.* ¶ 346.) Defendant "continued to ignored [Plaintiff's] obvious condition and left him to suffer." (*Id.*)

On October 23, 2020, Plaintiff "was seen for sick call" and "[t]he nurse noted in his chart that he needed pain medication for wrist and feet. Elavil did not work and different pain medication was needed." (*Id.* ¶ 347.) On October 24, 2020, Defendant "completed a MWAP and Chronic Pain Patient Reassessment form on [Plaintiff's] condition as a result of the *Allen* litigation." (*Id.* ¶ 348.)[5] "Despite discontinuing and refusing to represcribe Gabapentin to [Plaintiff] since he entered Franklin in October of 2019, Defendant [] noted on the form that Gabapentin was an effective medication that was stopped," and Defendant "further noted that she believed [Plaintiff] should be trialed on Gabapentin again." (Dkt. No. 12, ¶ 348.) "Despite Defendant['s] [] knowledge that Gabapentin was effective in treating [Plaintiff's] neuropathic pain, for approximately one year she never submitted an MWAP request form to even attempt to prescribe the medication to him"; "[i]nstead, she decided to watch [Plaintiff] deteriorate and needlessly suffer in pain without effective treatment." (*Id.* ¶ 349.)

On October 27, 2020, Defendant was informed that MWAP approvals for Gabapentin were being handled by the Chief Medical Officer ("CMO") of DOCCS "due to the *Allen* litigation." (*Id.* ¶ 350.) The CMO subsequently approved Defendant's MWAP request for Gabapentin. (*Id.*)

In June 2021, "an MRI of [Plaintiff's] right wrist showed damage including severe enlargement of the median nerve and probably median neuritis related to carpal tunnel syndrome." (*Id.* ¶ 351.) Defendant subsequently "prescribed [Plaintiff] Percocet in addition to Gabapentin to manage his pain." (*Id.* ¶ 352.) In July 2021, Plaintiff "underwent an MRI of his lumbar spine which showed he was suffering from degenerative lumbar spondylosis, including

---

[5] Plaintiff appears to be referring to class-action litigation in the Southern District of New York challenging the MWAP policy. *See Allen v. Koenigsmann*, No. 19-cv-8173 (S.D.N.Y.).

post-surgical changes from transpedicular posterior fixation and posterior decompressive surgery at L5-S1." (*Id.* ¶ 353.) On August 18, 2021, Plaintiff's "Percocet prescription was discontinued despite the effective relief it provided." (*Id.* ¶ 354.) Plaintiff "immediately complained of his increased pain to sick call and on September 1, 2021[,] his Percocet prescription was reinstated." (*Id.* ¶ 355.)

In December 2022, Plaintiff "was released" and "has been consistently and effectively treated since his release by outside providers." (*Id.* ¶ 356.)

Plaintiff alleges that he "was a victim of [a] grand plan" that involved certain DOCCS medical administrators determining "to remove certain medications from DOCCS[] facilities— not based on patients' needs or efficacy—but the perceived 'abuse potential' of the medication." (*Id.* at 53, ¶¶ 335, 337.) Plaintiff alleges that "DOCCS' Central Office started marking each facility's ability to get their patients off the medications" and that "[d]iscontinuations were done without medical justification or individualized assessments." (*Id.* at 53, ¶ 336.) "Despite having his medical records for review, Defendant . . . continuously refused to represcribe [Plaintiff's] effective treatment due to these policies and customs." (*Id.* at 53, ¶ 338.) Plaintiff "repeatedly and consistently reported his pain and suffering to no avail," and Plaintiff "suffered severely due to Defendant['s] adherence to the[se] customs, policies and practices." (*Id.* at 53, ¶¶ 338–39.)

## III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to

raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## IV.    DISCUSSION

### A.    Statute of Limitations

Defendant argues that Plaintiff's claim is time-barred and must therefore be dismissed. (Dkt. No. 26-3, at 20–22.) Plaintiff argues that he is entitled to (1) tolling under the continuing violation doctrine; (2) tolling pursuant to COVID-related executive orders; and (3) equitable tolling during the period in which Plaintiff was exhausting administrative remedies. (Dkt. No. 29, at 21–28.) Defendant argues (1) Plaintiff has not alleged acts within the relevant statutory period that are traceable to policy of deliberate indifference that would render the continuing violation policy applicable; (2) even applying tolling pursuant to COVID-related executive orders, Plaintiff's claim is still untimely; and (3) Plaintiff has not sufficiently pleaded facts demonstrating that he is entitled to equitable tolling arising from the administrative-exhaustion process. (Dkt. No. 31, at 9–12.)

"The statute of limitations for § 1983 actions arising in New York is three years." *Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020); *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) ("The statute of limitations for claims brought under Section 1983 is governed by state law, and [for an Eighth Amendment deliberate indifference claim] is the three-year period for personal injury actions under New York State law."). "A

12

Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.'" *Shomo*, 579 F.3d at 181 (quoting *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994)).

However, the "continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date,'" *id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)), which the Second Circuit has applied to Eighth Amendment deliberate indifference claims, *see Williams v. Annucci*, No. 20-cv-1417, 2021 WL 4775970, at *3, 2021 U.S. Dist. LEXIS 196917, at *8 (N.D.N.Y. Oct. 13, 2021) (collecting cases). The continuing violation doctrine "applies to claims 'composed of a series of separate acts that collectively constitute one unlawful [] practice.'" *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alteration in original) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004)). "To assert a continuing violation for statute of limitations purposes" in the context of an Eighth Amendment claim for deliberate indifference, "the plaintiff must 'allege both the existence of an ongoing policy of [deliberate indifference to his or her serious medical needs] and some non-time-barred acts taken in the furtherance of that policy.'" *Id.* at 182 (alteration in original) (quoting *Harris*, 186 F.3d at 250). This is because "[w]hen the plaintiff brings a Section 1983 claim challenging a . . . policy [of deliberate indifference], 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *See id.* at 181–82 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). The continuing violation doctrine does not, however, apply to "discrete unlawful acts, even if those discrete unlawful acts are part of 'serial violations.'" *See Lucente*, 980 F.3d at 309 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)).

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if

the defense appears on the face of the complaint." *See Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)). In the context of an alleged continuing violation, if a plaintiff alleges "some [] act that did occur within the statute of limitations, so that his claim would not be time-barred," *Harris*, 186 F.3d at 250, and "[t]he complaint suggests a pattern" of deliberately indifferent treatment, *see Shomo*, 579 F.3d at 182, an Eighth Amendment claim for deliberate indifference can withstand a challenge for failure to state a claim.

Here, Plaintiff alleges that on October 30, 2019, Defendant "was aware that [Plaintiff] had been treated with Gabapentin and Tylenol #3 to manage his pain, knew that they were discontinued when he arrived at Franklin, knew that Gabapentin and Tylenol #3 were effective[] treatments for [Plaintiff] for years, and knew that [Plaintiff] was obviously suffering uncontrolled pain from the discontinuation of those prescription medications," but Defendant "ignored [Plaintiff's] suffering and refused to represcribe him his effective medication," instead prescribing "ineffective medications such as ibuprofen and Lamictal for his neuropathic and chronic pain condition, despite the fact she knew that Gabapentin and Tylenol #3 were effective treatment." (Dkt. No. 12, ¶¶ 325, 332–334.)

The amended complaint also contains the following allegations involving Defendant: "Despite Defendant Mandalaywala's knowledge that Gabapentin was effective in treating [Plaintiff's] neuropathic pain, for approximately one year she never submitted an MWAP request form to even attempt to prescribe the medication to him. Instead, she decided to watch [Plaintiff] deteriorate and needlessly suffer in pain without effective treatment." (*Id.* ¶ 349.) Specifically, in November 2019, Plaintiff "continued to complain to medical staff of chronic pain and requested an appointment with his doctor," and on December 4, 2019, despite x-rays demonstrating

14

worsening injuries, Defendant "provided no effective adjustments to [Plaintiff's] pain medication," and Plaintiff "continued to suffer as a result." (*Id.* ¶¶ 335–36.) On December 5, 2019, after falling out of his wheelchair and being "seen for pain and swelling in his right hand, left leg, left ankle, and left foot pain and swelling," Plaintiff "continued to report uncontrolled neuropathic pain in his feet," and Defendant, "despite [Plaintiff's] suffering and requests for Gabapentin, . . . refused to represcribe him the knowingly effective medication." (*Id.* ¶ 337.) "Throughout [December 2019], [Plaintiff] continued to suffer from his diabetic neuropathy and severe pain in his feet," "continued to inform [Defendant] and other staff of uncontrolled neuropathic pain and . . . requested Gabapentin, which effectively treated his feet pain for years," but Defendant "continued to ignore his pleas for effective treatment and failed to individually assess [Plaintiff] for his medical needs," and as a result, Plaintiff "continued to needlessly suffer from uncontrolled neuropathic pain and ineffective treatment." (*Id.* ¶ 340.) On September 30, 2020, Defendant "prescribed Elavil to attempt to treat [Plaintiff's] neuropathic pain," and "[a] few days later, [Plaintiff] experienced significant side effects from the prescription and it was discontinued." (*Id.* ¶ 343.) But Defendant, "despite remain[ing] aware that [Plaintiff's] neuropathic pain had been controlled with Gabapentin for years before she discontinued it," "did not prescribe alternative medication; she only placed [Plaintiff] back on acetaminophen" and "continued to refuse a prescription of [Gabapentin]," leaving Plaintiff "in such severe uncontrolled neuropathic pain that he could not go to his outside specialist appointments." (*Id.* ¶¶ 344–46.) Finally, after being "seen for sick call on October 23, 2020," and "a nurse not[ing] in [Plaintiff's] chart that he needed pain medication for wrist and feet" and that "Elavil did not work and different pain medication was needed," on October 24, 2020, Defendant "completed a MWAP and Chronic Pain Patient Reassessment form on [Plaintiff's] condition as a result of the

*Allen* litigation," noting "on the form that Gabapentin was an effective medication that was stopped" and that Defendant "believed [Plaintiff] should be trialed on Gabapentin again." (*Id.* ¶¶ 347–48.) The MWAP request for Gabapentin was approved on October 27, 2020. (*Id.* ¶ 350.)[6]

Plaintiff also alleges that "in approximately 2015, [certain] members of DOCCS medical administration determined to remove certain medications from DOCCS' facilities—not based on patients' needs or efficacy—but the perceived 'abuse potential' of the medication." (*Id.* at 53, ¶ 335.) Plaintiff further alleges that "DOCCS' Central Office started marking each facility's ability to get their patients off the medications," and "[d]iscontinuations were done without medical justification or individualized assessments." (*Id.* at 53, ¶ 336.) Plaintiff alleges that "[d]espite having his medical records for review, Defendant . . . continuously refused to represcribe [Plaintiff's] effective treatment due to these policies and customs," and Plaintiff "suffered severely due to Defendant['s] adherence to the[se] customs, policies and practices." (*Id.* at 53, ¶¶ 338–39.)

Accepting all facts in the amended complaint as true and drawing all reasonable inferences in Plaintiff's favor—as the Court must at this stage—Plaintiff has plausibly alleged that, as a result of adherence to a policies and customs of removing certain medications from DOCCS facilities, which were unrelated to patient needs or efficacy and done without medical justification or individualized assessments, Plaintiff was denied effective medical treatment by Defendant between October 30, 2019, and September 30, 2020. That is, Plaintiff has alleged an ongoing policy of deliberate indifference from October 30, 2019, to September 30, 2020, and acts by Defendant in furtherance of that policy throughout that span as late as September 30,

---

[6] Plaintiff also alleges that Defendant prescribed him Percocet in June 2021, the Percocet prescription "was discontinued despite the effective relief it provided" on August 18, 2021, and on September 1, 2021, Plaintiff's "Percocet prescription was reinstated." (*Id.* ¶¶ 351–55.) But Plaintiff does not allege Defendant's personal involvement in discontinuing (or reinstating) the Percocet prescription.

2020. Plaintiff filed his original complaint on August 12, 2023. (Dkt. No. 1.) Because the complaint was filed within three years of the latest alleged act of Defendant in furtherance of the alleged policy of deliberate indifference, which occurred on September 30, 2020, the continuing violation doctrine renders Plaintiff's claim timely. Accordingly, Defendant's motion to dismiss Plaintiff's claim as time-barred is denied.[7]

### B.      Eighth Amendment Deliberate Medical Indifference

Defendant argues that Plaintiff's allegations amount to mere disagreement with Defendant's chosen treatments, which is insufficient to provide a basis for an Eighth Amendment claim, and that Plaintiff alleges no facts from which it can be reasonably inferred that Defendant knew of and disregarded an excessive risk of substantial harm to Defendant when she "treated Plaintiff with numerous medications in lieu of Gabapentin and/or Tylenol #3." (Dkt. No. 26-3, at 16–19.)[8] Plaintiff argues that he has not alleged "disagreement on a course of treatment" or that "there was a constitutional obligation to continue medications prescribed by others IF a medical provider conducted an individualized assessment of a patient's needs and medically determined a change was warranted" but rather that Defendant "knew the best course of treatment was to continue to prescribe Plaintiff's effective treatment, but, instead, she deliberately and blindly followed DOCCS' policy and replaced Plaintiff's effective treatment with easier and knowingly

---

[7] Because the continuing violation doctrine renders Plaintiff's claim timely, the Court need not consider tolling pursuant to COVID-related executive orders or during the period in which Plaintiff was exhausting administrative remedies.

[8] Defendant also argues that Plaintiff failed to administratively exhaust administrative remedies. (Dkt. No. 26-3, at 22–24.) While the Prison Litigation Reform Act ("PLRA") mandates that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a), Plaintiff has alleged that he was released from prison in December 2022, (Dkt. No. 12, ¶ 356), eight months before he filed this action, (Dkt. No. 1). Therefore, the PLRA's exhaustion requirement is inapplicable. *See Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) ("[L]itigants . . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision.").

less efficacious medication." (Dkt. No. 29, at 16–21.) Plaintiff further argues that the fact that Defendant prescribed alternative treatments does not excuse her from liability because those treatments were "less efficacious" and did not address "the gravamen of Plaintiff's problem." (*Id.* at 21.)

The Eighth Amendment, applicable to the states through the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 666–67 (1962), prohibits the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. This prohibition establishes "the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (alteration in original) (quoting *Estelle*, 429 U.S. at 104). "The standard of deliberate indifference includes both subjective and objective components." *Id.* "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Id.* (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries": (1) "whether the prisoner was actually deprived of adequate medical care," and (2) "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006).

The first inquiry under the objective component requires examining "whether the prisoner was actually deprived of adequate medical care." *Id.* at 279. Prison officials who act "reasonably" in response to an inmate's health risk will not be found liable because the official's duty is only to provide "reasonable care." *Id.* at 279–80. The second inquiry under the objective component requires examining whether the purported inadequacy in the medical care is

"sufficiently serious." *Id.* at 280. If the "unreasonable care" consists of a failure to provide treatment, then the court must examine whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Id.* (alteration in original) (quoting *Chance*, 143 F.3d at 702). "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower," *id.*, and it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant," *Smith*, 316 F.3d at 186 (citing *Chance*, 143 F.3d at 702–03).

As to the subjective component of a deliberate indifference claim, a plaintiff must show that the defendant "act[ed] with a sufficiently culpable state of mind." *Chance*, 143 F.3d at 702 (quoting *Hathaway*, 37 F.3d at 66). The defendant's "state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. That is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105–06. Nor does the "mere disagreement over the proper treatment . . . create a constitutional claim[;] [s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

Here, Plaintiff alleges that he suffers from "obesity, Type II diabetes[,] diabetic neuropathy," and cervical spine syndrome, which result in a "chronic pain condition" and that, throughout the relevant period during which Defendant was treating Plaintiff, Plaintiff experienced, inter alia, uncontrolled chronic neuropathic pain. (Dkt. No. 12, ¶¶ 313, 319–20, 328, 332, 335, 337–38, 340–42, 346–47.) Plaintiff alleges that upon his transfer to Franklin, his pain was "at a scale of 10 out of 10." (*Id.* ¶ 328.) Defendant does not argue that Plaintiff has failed to plead that this was, in objective terms, sufficiently serious. Rather, Defendant's motion is premised on the contention that Defendant did not know of and disregard an excessive risk of substantial harm to Defendant because Defendant provided medical treatment, and any allegations of the insufficiency of that treatment amount to mere disagreement between Plaintiff and Defendant. (Dkt. No. 26-3, at 16–19.)

Defendant is correct that "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. But this is so where there exists such disagreement *and* the medical treatment that is provided is adequate. *See id.* ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). The cases on which Defendant relies demonstrate this requirement. *See Acosta v. Thomas*, 837 F. App'x 32, 35 (2d Cir. 2020) (summary order) (finding no Eighth Amendment deliberate indifference claim where there was disagreement as to proper care but "the medical records show that [the plaintiff] was monitored, that [a doctor] exercised his medical judgment to take [the plaintiff] off Neurontin, that Tylenol addressed [the plaintiff's] pain, and that his overall treatment was adequate"); *Reyes v. Gardener*, 93 F. App'x 283, 285 (2d Cir. 2004) (summary order) ("[The plaintiff] has offered no evidence . . . showing that the prescribed medication regimen deviated from reasonable medical practice

for the treatment of his condition, much less has he shown, as would be necessary to prove an Eighth Amendment claim, that defendants were not merely negligent, but aware that their prescribed treatment plan was medically inadequate."); *Walker v. Cuomo*, No. 20-cv-82, 2020 WL 8483820, at \*6–7, \*14, 2020 U.S. Dist. LEXIS 249996, at \*15–18, \*37 (N.D.N.Y. Mar. 31, 2020) (finding that "[i]nsofar as [the plaintiff] alleges . . . he does not agree with treatment he received, such allegations are . . . insufficient to state an Eighth Amendment medical indifference claim" where there are no allegations that such treatment is medically inadequate); *Bishop v. Presser*, No. 16-cv-1329, 2019 WL 442154, at \*3, 2019 U.S. Dist. LEXIS 18133, at \*6 (N.D.N.Y. Feb. 5, 2019) ("[The plaintiff's] disagreement with the dentists' treatment is not enough to constitute a deliberate medical indifference . . . [where] three dentists agreed that it was not appropriate to perform an extraction without first treating [the plaintiff's] tooth infection and thus . . . prescrib[ing] antibiotics and pain medication.").

Plaintiff has alleged that, upon entering Defendant's care at Franklin, Plaintiff experienced, inter alia, uncontrolled chronic neuropathic pain. (Dkt. No. 12, ¶¶ 313, 319–20, 328, 332, 335, 337–38, 340–42, 346–47.) Despite Defendant's various treatments, this condition persisted at least until the date on which Defendant submitted an MWAP form for Plaintiff. (*Id.* ¶¶ 332–337, 340, 344–47, 349.) Plaintiff further alleges that Gabapentin and Tylenol #3 were effective treatments, Defendant knew they were effective treatments but refused to represcribe them, and this resulted in continuing chronic pain of which Defendant was aware. (Dkt. No. 12, ¶¶ 317, 323, 330, 333–34, 336–37, 340, 343–46, 348.)

Defendant lists the treatments Plaintiff alleges Defendant provided. (Dkt. No. 26-3, at 16–17; *see also* Dkt. No. 31, at 6.) It is true that where a deliberate indifference claim is based on "delay or interruption" in treatment rather than "failure to provide any treatment," the analysis of

the seriousness of the alleged inadequacy of treatment is "narrower," and the inquiry focuses not on the seriousness of the underlying condition itself but on the impact of the delay or interruption in treatment. *See Salahuddin*, 467 F.3d at 280. But "even if an inmate receives 'extensive' medical care, a claim is stated if . . . the gravamen of his problem is not addressed," *Sulton v. Wright*, 265 F. Supp. 2d 292, 298 (S.D.N.Y. 2003), *abrogated on other grounds by Richardson v. Goord*, 347 F.3d 431 (2d Cir. 2003). While Plaintiff did receive some care from Defendant, accepting all facts in the amended complaint as true and drawing all reasonable inferences in Plaintiff's favor, Defendant's failure to adequately address Plaintiff's condition from his arrival at Franklin in October 2019 until October 2020, despite knowing of an effective treatment, resulted in a sufficiently serious deprivation to give rise to an Eighth Amendment deliberate indifference claim. *see Chance*, 143 F.3d at 703 (holding that "extreme pain" is sufficiently serious to give rise to an Eighth Amendment deliberate indifference claim); *Jahad v. Holder*, No. 19-cv-4066, 2023 WL 8355919, at *6, 2023 U.S. Dist. LEXIS 215553, at *16–17 (S.D.N.Y. Dec. 1, 2023) (collecting cases and holding that prolonged chronic pain constitutes a "sufficiently serious deprivation").

Plaintiff has also alleged that he was a "victim of [a] grand plan" under which medications were removed from DOCCS facilities based on policies and customs related to the perceived abuse potential of the medicines, not based on patients' needs or efficacy; that discontinuances were done "without medical justifications or individualized assessments"; that doctors, including Defendant, continued to refuse to represcribe Plaintiff's effective treatment "due to these policies and customs"; and that Plaintiff "suffered severely due to Defendant[']s adherence to these customs, policies and practices." (*Id.* ¶¶ 335–39); *see Brock v. Wright*, 315 F.3d 158, 167 (2d Cir. 2003) ("[T]he policy [precluding use of certain medications], the jury may

conclude, represents a conscious choice by DOCS to prescribe '"easier and less efficacious"
treatment plan[s]' . . . . Such a choice violates the Eighth Amendment." (third alteration in
original) (citations omitted)). Thus, Plaintiff has plausibly alleged inadequate treatment, which
renders Defendant's reliance on cases involving "mere disagreement" inapt.

Furthermore, Defendant's contention that Plaintiff "does not offer any specific facts to
corroborate" his allegation that Defendant "knew that Gabapentin and Tylenol #3 were effective
treatments for [Plaintiff] for years," (Dkt. No. 26-3, at 18; *see also* Dkt. No. 31, at 7–8), is
squarely contradicted by the amended complaint. Plaintiff alleges that as a pretrial detainee and
at Downstate prior to his transfer to Franklin, he was prescribed Gabapentin and Tylenol #3 and
that this "pain medication regime provided him 'good results' with 'reported relief.'" (Dkt. No.
12, ¶¶ 315, 317, 322–23.) Plaintiff also alleges that his medical records from his pre-DOCCS
detention and his DOCCS medical records from Downstate listed these medications and
indicated their effectiveness, (*id.* ¶¶ 316, 320, 323), and that his "indraft documents" for his
transfer to Franklin list these medications, (*id.* ¶ 326). From these allegations it is reasonable to
infer that Defendant "was aware that [Plaintiff] had been treated with Gabapentin and Tylenol #3
to manage his pain, knew that they were discontinued when he arrived at Franklin, knew that
Gabapentin and Tylenol #3 were effective[] treatments for [Plaintiff] for years, and knew that
[Plaintiff] was obviously suffering uncontrolled pain from the discontinuation of those
prescription medications." (*Id.* ¶ 333; *see also id.* ¶ 345.) Moreover, Plaintiff alleges specifically
that, when Defendant ultimately completed an MWAP form for Plaintiff, she "noted on the form
that Gabapentin was an effective medication that was stopped" and that "that she believed
[Plaintiff] should be trialed on Gabapentin again." (*Id.* ¶ 348.) These allegations stand in stark
contrast to the unsupported and conclusory allegations at issue in the cases Defendant cites. (Dkt.

No. 26-3, at 18–19); *see, e.g., Darby v. N.Y.C. Health & Hosps. Corp.*, No. 18-cv-2869, 2019

WL 1994490, at *5, 2019 U.S. Dist. LEXIS 76049, at *13 (E.D.N.Y. May 6, 2019) (granting the

defendant's motion to dismiss an Eighth Amendment deliberate indifference claim where the

"plaintiff d[id] not allege *any* facts as to why [prescribed treatment] was wrong, or how

defendant knew or should have known it was wrong, other than the fact that plaintiff told him it

was wrong" (emphasis added)), *aff'd sub nom. Darby v. Greenman*, 14 F.4th 124 (2d Cir.

2021).[9]

       Defendant also argues that she had no constitutional duty to provide "continuity of care"

based on the treatments Plaintiff had received before entering Franklin. (Dkt. No. 31, at 8; *see*

*also* Dkt. No. 26-3, at 18.) Defendant is correct that "[t]he mere fact that DOCS physicians in

other facilities may have previously provided [a] plaintiff with some of the treatments . . . he

demanded . . . does not render the medical decisions of [a defendant] 'deliberate indifference.'"

*See Gillespie v. N.Y. State Dep't of Corr. Servs.*, No. 08-cv-1339, 2010 WL 1006634, at *6, 2010

U.S. Dist. LEXIS 26246, at *18 (N.D.N.Y. Feb. 22, 2010) (collecting cases), *report and*

*recommendation adopted*, 2010 WL 1006643, 2010 U.S. Dist. LEXIS 26221 (N.D.N.Y. Mar. 19,

2010). But Defendant does not square this argument with Plaintiff's allegations that Defendant's

---

[9] Plaintiff's citation of *Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005), is of limited utility. In *Johnson*, the Second Circuit relied predominantly on the fact that "every single one of [the] plaintiff's treating physicians, including prison physicians, indicated to the defendants that prescribing [a certain medication] to the plaintiff was the medically appropriate course of treatment" but the defendants "ignore[d] the unanimous advice of [the plaintiff's] treating physicians." *See* 412 F.3d at 404; *cf. Allen v. Koenigsmann*, No. 19-cv-8173, 2022 WL 1597424, at *6–7, 2022 U.S. Dist. LEXIS 90413, at *16–19 (S.D.N.Y. May 19, 2022) ("Plaintiffs have adequately pleaded facts to permit the [c]ourt to infer that [the defendants'] dismissal of specialty doctors' recommendations of MWAP medications without explanation diverged from reasonable medical practices because of the MWAP policy and not [the defendants'] medical judgment. . . . Thus, [the defendants'] motion to dismiss for failure to state a claim is denied."). Here, there are no allegations that Defendant ignored the advice of any other medical professional. Nevertheless, accepting all facts in the amended complaint as true and drawing all reasonable inferences in Plaintiff's favor, the amended complaint plausibly alleges that Defendant was aware of the effectiveness of Plaintiff's prior treatments and was therefore "put on notice [of what] the medically appropriate decision could be," and Plaintiff's allegations of Defendant's refusal to represcribe Plaintiff's effective treatment for debilitating pain due to DOCCS policies and customs that were not based on patients' needs or efficacy plausibly state an Eighth Amendment deliberate indifference claim, s*ee Johnson*, 412 F.3d at 406, at the motion to dismiss stage.

treatment of Plaintiff was based on her adherence to policies and customs that were not based on

patients' needs or efficacy and that it was constitutionally inadequate. For instance, Defendant

relies on *Acosta v. Thomas*, which involved "mere disagreement" between physicians at different

facilities that resulted in differing treatments that were nevertheless constitutionally adequate.

*See* 837 F. App'x at 35. But because Plaintiff has alleged that Defendant's treatment was not

adequate, Defendant's argument is unavailing.

Finally, Defendant argues in reply that even if Defendant "acted in 'reflexive'

compliance to prison policies without exercising medical judgment, that is still not enough to

establish" Plaintiff's claim because "[f]ollowing a mandatory prison policy, *without more*, does

not amount to a 'conscious disregard of a substantial risk of harm.'" (Dkt. No. 31, at 6 (emphasis

added) (quoting *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003)).) But, as with other

cases cited by Defendant, *Hernandez*—in which the Second Circuit held that medical

malpractice is not tantamount to deliberate indifference—involved undisputed exercises of

medical judgment that result in mere disagreement in determining appropriate treatments. *See*

341 F.3d at 146–47 ("[The] decision to perform or not perform [a surgery] was 'purely an issue

of medical judgment.' This is precisely the sort of issue that cannot form the basis of a deliberate

indifference claim." (citation omitted)). Here, Plaintiff expressly alleges that Defendant refused

to represcribe effective treatment for Plaintiff's debilitating pain due to DOCCS policies and

customs that were not based on patients' needs or efficacy. (Dkt. No. 12, ¶¶ 336–37.)

Moreover, Defendant misconstrues Plaintiff's argument related to Defendant's medical

judgment. Plaintiff does not argue, as Defendant suggests, that the Court should deny

Defendant's motion because there exist questions of fact as to whether Defendant exercised

*proper* medical judgment. (Dkt. No. 31, at 5–6.) Rather, Plaintiff argues that he has pleaded a

prima facie case of deliberate indifference against Defendant because he has alleged that Defendant's inadequate treatment was "policy driven—and not medical judgment." (Dkt. No. 29, at 18.) "[J]udgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment . . . may provide the basis of a claim" under the Eighth Amendment. *Stevens v. Goord*, 535 F. Supp. 2d 373, 388 (S.D.N.Y. 2008); *see also Tavares v. N.Y.C. Health & Hosps. Corp.*, No. 13-cv-3148, 2015 WL 158863, at *6, 2015 U.S. Dist. LEXIS 3815, at *18 (S.D.N.Y. Jan. 13, 2015) ("The allegation that a physician chose to give less efficacious treatment for reasons not deriving from medical judgment can support a deliberate indifference claim.").

In sum, Plaintiff has plausibly alleged a sufficiently serious deprivation in his medical care by Defendant and that Defendant knew of and disregarded an excessive risk to his health or safety by refusing to represcribe Plaintiff known effective treatments due to DOCCS policies and customs that were not based on patients' needs or efficacy. *See Brunache v. Annucci*, No. 22-cv-196, 2023 WL 146850, at *11, 2023 U.S. Dist. LEXIS 4529, at *30–31 (W.D.N.Y. Jan. 9, 2023). Accordingly, Defendant's motion to dismiss is denied.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss under Rule 12(b)(6), (Dkt. No. 26), is **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>July 29, 2024</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge