**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────

ROBERT DANIELS,

                         Plaintiff,                 9:23-cv-983
                                                 (ECC/CBF)

v.

PRITI MANDALAYWALA,

                         Defendant.

───────────────────────────────

TODD BRIGLIN,

                          Plaintiff,                 9:23-cv-1001
                                                 (ECC/CBF)

v.

GERALD CAHILL,

                         Defendant.

───────────────────────────────

Amy J. Agnew, Esq., *for Plaintiffs*
Oriana L. Kiley, Esq., *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

The Plaintiffs in the above-captioned, related actions allege deliberate indifference to their medical needs while in the custody of the Department of Corrections and Community Supervision (DOCCS), in violation of the Eighth Amendment under 42 U.S.C. §1983.  Presently before the Court are the Defendants' respective motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *Daniels v. Mandalaywala* (*Daniels*), Case No. 9:23-cv-983 (N.D.N.Y.) at Dkt. No. 56; *Briglin v. Dinello* (*Briglin*), Case No. 9:23-cv-1001 (N.D.N.Y.) at Dkt.

No. 75.  Defendants in both actions have also requested the Court preclude the opinion and testimony of the Plaintiffs' expert.  *Id.*  The motions are fully briefed.  *Daniels* at Dkt. Nos. 63, 64, 66, 68, 69, 70, 71, 72, 75; *Briglin* at Dkt. Nos. 76, 77, 78, 87, 88, 90, 93.  For the reasons that follow, the *Daniels* motion for summary judgment is granted in part and denied in part, the *Briglin* motion for summary judgment is denied, and the motions to preclude the opinion and testimony of Dr. Carinci are denied without prejudice to renew as a motion in limine.

## II.    BACKGROUND

### A.    The MWAP Policy[1]

In 2017, DOCCS adopted the Medications with Abuse Potential (MWAP) Policy.  The MWAP Policy regulated the prescription of certain medications that were deemed to carry a risk of abuse or dependence.  Under the MWAP Policy, primary care providers in DOCCS facilities seeking to prescribe a designated medication had to complete and submit a request form to a Regional Medical Director (RMD) for approval.  As relevant to these related actions, medication that required RMD approval under the MWAP Policy included Neurontin, known by its generic name Gabapentin, and Lyrica, known by its generic name Pregabalin.  Defendants, in their roles as DOCCS physicians, were obligated to follow the MWAP Policy.

In February 2021, DOCCS rescinded the MWAP Policy and adopted Health Services Policy 1.24(A).  Policy 1.24(A) reformed DOCCS's process for prescribing pain management medication and eliminated the RMD's prior role entirely.

---

[1] The facts contained in this section giving context to the MWAP Policy are undisputed by the parties, and are taken from the Statement of Material Facts, and responses thereto, in each of the related actions.  *See Daniels* at Dkt. No. 64 ¶¶ 1, 3, 4-7, 9, 20-22; *Briglin* at Dkt. No. 87 ¶¶ 100-103.

B.    MWAP Policy Class Action Litigation

The MWAP Policy has since been subject to class-action litigation brought by several named DOCCS inmates on behalf of a class of individuals in DOCCS custody whose medications were denied or discontinued pursuant to the policy.  *See Allen v. Koenigsmann,* No. 19-cv-8173, 2023 WL 2731733 (S.D.N.Y. Mar. 31, 2023).  Plaintiffs in the class action asserted deliberate indifference to medical needs claims pursuant to 42 U.S.C. § 1983.  Ultimately, the *Allen* plaintiffs were granted a permanent injunction enjoining implementation of the MWAP Policy and awarded attorneys' fees.  *Allen v. Koenigsmann,* 700 F. Supp. 3d 110, 145 (S.D.N.Y. 2023).  The permanent injunction, among other things, required DOCCS to complete an "individualized assessment" of incarcerated individuals who suffer from chronic pain and were denied or discontinued from medication pursuant to the MWAP Policy. *Allen*, No. 19-cv-8173 (S.D.N.Y.), Dkt. No. 813 at 12-14.

The *Allen* Court denied the plaintiffs' motion to certify a class to pursue damages for liability.  *Allen*, 2023 WL 2731733, at \*6.  Thus, various plaintiffs have since filed individual suits for damages against DOCCS employees alleging violations of § 1983 based on deliberate indifference to their serious medical needs.

III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    APPLICABLE LAW

### A.    Personal Involvement

It is well-settled that, to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted).  A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  There is "no special rule for supervisory liability," and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  The Second Circuit has explained that "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," and "[t]he violation must be established against the supervisory official directly." *Id*. (second alteration in original) (internal quotations and citations omitted).

### B.    Deliberate Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition encompasses the provision of medical care involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). However, not "every injury" a prisoner suffers "translates into constitutional liability for prison officials." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  In order to establish an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See id*. This standard requires proof of both an objective and subjective element.

### 1.    Objective Element

There is a two-part inquiry to determine whether an alleged deprivation is "objectively serious." *Benjamin v. Pillai,* 794 F. App'x 8, 11 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to an inmate-health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Salahuddin*, 467 F.3d at 279-80 (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Benjamin*, 794 F. App'x at 11 (citing *Salahuddin*, 467 F.3d at 280). The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Salahuddin*, 467 F.3d at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185-86). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Benjamin*, 794 F. App'x at 11. The court in *Benjamin* reiterated that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* (citing *Smith*, 316 F.3d at 185).

### 2.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Benjamin*, 794 F. App'x at 11 (citing *Hathaway v. Coughlin*, 511 U.S.

825, 553 (2d Cir. 1996)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition, that the charged official possessed "'a state of mind that is the equivalent of criminal recklessness.'" *Benjamin,* 794 F. App'x at 11 (quoting *Hathaway*, 99 F.3d at 553).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Abreu v. Lipka,* 778 F. App'x 28, 32 (2d Cir. 2019) (quoting *Smith,* 316 F.3d at 184). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer,* 730 F. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right

to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

### C.    Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "Even if an officer violated a plaintiff's clearly established rights, he 'will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights.'" *Clark v. Valletta*, 157 F.4th 201, 209 (2d Cir. 2025) (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)). "These protections 'balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (cleaned up). "The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality, instead emphasizing that clearly established law must be particularized to the facts of the case." *Clark,* 157 F.4th at 209 (citing *Francis v. Fiacco,* 942 F.3d 126, 146 (2d Cir. 2019)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quotation marks omitted). In the context of deliberate indifference in violation of the Eighth

Amendment, assertions of qualified immunity "are not analyzed body-part by body-part" or with "specificity as to the site and cause of pain[.]" *Collymore v. Myers*, 74 F.4th 22, 30 (2d Cir. 2023). However, "the clearly established right must be defined with specificity," and the "dispositive question is whether the violative nature of particular conduct is clearly established." *Vega v. Semple*, 963 F.3d 259, 275 (2d Cir. 2020) (emphasis in original) (internal quotations and citations omitted). The Court must therefore undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.*

## V.    DISCUSSION

### A.    Plaintiff Robert Daniels[2]

#### 1.    Facts[3]

Daniels was an incarcerated individual housed at Franklin Correctional Facility (Franklin C.F.) from 2019 through his release from DOCCS custody in 2022.  Dkt. No. 64 ¶¶ 67, 319. Daniels suffers from numerous chronic ailments, including Type II diabetes, diabetic neuropathy, radiating back pain, and a prior "crush injury" of the right forearm with hand pain.  *Id.* at ¶ 26.  He was also diagnosed with gout.  *Id.* at ¶ 41.  Daniels was prescribed Gabapentin after he suffered from a back injury in approximately 2012.  *Id.* at ¶ 27.  Daniels injured his right extremity in 2019, before entering DOCCS custody, when his right hand was caught in a cell door.  *Id.* at ¶¶ 29-32.

---

[2] All references to docket entries in this section refer to those filed in *Daniels v. Mandalaywala*, Case No. 9:23-cv-983 (N.D.N.Y), unless otherwise noted.

[3] The facts are drawn from the parties' submissions, including Dr. Mandalaywala's Statement of Material Facts, Dkt. No. 56-1, and Daniels' response to that statement, Dkt. No. 64, to the extent those facts are well-supported by pinpoint citations to the record and the exhibits the parties have submitted. Disputed facts are noted.  The facts are construed in the light most favorable to Daniels as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

In October 2019, before his transfer into DOCCS's custody, Daniels' prescribed medications included Tylenol #3 and Gabapentin. Dkt. No. 64 ¶ 40. On October 17, 2019, Daniels was transferred into DOCCS custody at Downstate Correctional Facility (Downstate C.F.) and was admitted to the infirmary. *Id.* at ¶ 42. He underwent a full medical examination, and his prescriptions for Tylenol #3 and Gabapentin were continued. *Id.* at ¶¶ 43-44. Approval under the MWAP Policy was not necessary, because Downstate C.F. was a reception center. *Id.* at ¶ 45. The parties dispute to what extent the Tylenol #3 and Gabapentin controlled Daniels' pain while he was at Downstate C.F. Dkt. Nos. 56-1 ¶¶ 46-57, 64 ¶¶46-57.

Daniels was transferred to Franklin C.F. on October 29, 2019, and admitted to the infirmary upon arrival. Dkt. No. 64 ¶ 67. At some point, his prescriptions for Gabapentin and Tylenol #3 were discontinued. *Id.* at ¶ 69; Dkt. No. 57-2 at 106. The parties dispute whether Daniels' prescriptions were discontinued by RN Kimberly Clark or by Defendant Dr. Mandalaywala. Dkt. Nos. 56-1 ¶ 69; 64 ¶ 69.

Dr. Mandalaywala's first encounter with Daniels occurred on October 30, 2019, the day after he arrived at Franklin C.F. Dkt. No. 64 ¶ 70. Dr. Mandalaywala reviewed Daniels' medical records and submitted a request to prescribe Gabapentin, pursuant to the MWAP Policy. *Id.* at ¶ 71. The request was denied by Dr. David Dinello, an RMD. *Id.* at ¶ 73. The parties dispute to what extent Dr. Mandalaywala could challenge, appeal or otherwise dispute an RMD's denial of a request to prescribe medication under the MWAP Policy. Dkt. Nos. 56-1 ¶¶ 8, 11, 12, 13, 16; 64 ¶¶ 8, 11, 12, 13, 16. Dr. Mandalaywala contends that after Dr. Dinello denied her request, she treated Daniels "with a trial-and-error approach" featuring "various medications and treatment regimens which, in her medical judgment, were reasonable and efficacious." Dkt. No. 56-1 ¶¶ 84-86. Daniels contends that the efforts taken by Dr. Mandalaywala as alternative treatments for his

neuropathy and radiculopathy were deficient. Dkt. No. 64 ¶¶ 84-86. Specifically, Dr. Mandalaywala submitted an order to begin Daniels on Lamictal. Dkt. No. 64 ¶¶ 87-88. She also prescribed Daniels insulin for his diabetes and diabetic neuropathy, and Prednisone for his gout. *Id.* at ¶¶ 94-96, 100. In addition, Dr. Mandalaywala ordered Daniels a wheelchair. *Id.* at ¶ 98.

Daniels received a wheelchair on November 1, 2019, and was discharged from the infirmary to the general population at Franklin C.F. Dkt. No. 64 ¶ 106. At times during the following twelve months, Daniels complained of and was treated for a variety of medical ailments, including ongoing neuropathy and radiculopathy pain, both by Dr. Mandalaywala and other medical providers. On February 20, 2020, Dr. Mandalaywala referred Daniels for an emergency telemedical appointment to address Daniels' complaints of "right arm pain and prickling" after recent surgery on his right arm. *Id.* at ¶ 131-34. The examining physician made a note to the providers at Franklin C.F. to "[c]onsider adding gabapentin to pain regimen[.]" *Id.* at ¶ 136. In May 2020, Dr. Mandalaywala prescribed Glizpide and Januvia to treat Daniels' high blood sugar. Dkt. No. 64 ¶¶ 175-76. She also referred Daniels to occupational therapy to address his hand pain following surgery. Dkt. No. 64 ¶¶ 178-79.

The record reflects that, for reasons and to a degree subject to some dispute among the parties, Daniels was not always compliant with his medical regimen, at times refusing to attend appointments and take medication. Dkt. Nos. 56-2 ¶¶ 160-61, 165, 166, 173-74, 195, 213, 224-26; 64 ¶¶ 160-61, 165, 166, 173-74, 195, 213, 224-26. In June 2020, Dr. Mandalaywala prescribed Daniels Depakote, after noting his "diabetic peripheral neuropathy" and prior refusal of Lamictal. Dkt. No. 64 ¶ 187. Dr. Mandalaywala also approved the reinstatement of Daniels' special diet request in August 2020 after it was discontinued, "with the hope that he would abide by it and that it would alleviate his overall pain condition." *Id.* at ¶ 198.

In August 2020, Dr. Mandalaywala referred Daniels for a follow-up appointment with his hand-surgeon, and pursued a recommendation that Daniels undergo an electromyogram (EMG)/nerve conduction study. Dkt. No. 64 ¶¶ 199, 206. Daniels refused to attend the EMG/nerve conduction study due to swelling in his feet and legs, and his high pain levels. *Id.* at ¶ 209; Dkt. No. 57-2 at 303. Daniels complained of bilateral leg swelling to Dr. Mandalaywala on September 30, 2020, and expressed an unwillingness to continue on Depakote. Dkt. No. 64 ¶¶ 210, 216. Dr. Mandalaywala prescribed Daniels Elavil to treat his pain. *Id.* at ¶¶ 216-17. The same day, Dr. Mandalaywala referred Daniels for a Nephrology evaluation. *Id.* at ¶ 221; Dkt. No. 69-9 at 20. Soon after, Daniels refused his Elavil prescription because it made him drowsy, and requested to stop taking it. Dkt. No. 64 ¶ 223-24.

Daniels was seen by Dr. Mandalaywala on October 26, 2020. Dr. Mandalaywala contends that Daniels was seen for a "sick call" for wrist pain. Dkt. Nos. 56-1 ¶ 227; 57-3 at 7. Daniels maintains that he was seen by Dr. Mandalaywala to receive his reassessment as ordered pursuant to the class-action litigation over the MWAP Policy. Dkt. Nos. 64 ¶ 227; 66-16. Dr. Mandalaywala submitted a second request form to prescribe Gabapentin that day. Dkt. No. 64 ¶ 235. The request was approved on October 27th, the following day. *Id.* at ¶ 236.

### 2.    Summary Judgment Analysis

#### i.    Personal Involvement

Dr. Mandalaywala argues that Daniels cannot establish her personal involvement in the challenged deprivation of care. Dkt. No. 56-2 at 12-14. Specifically, Dr. Mandalaywala argues that (1) she did not discontinue Daniels' medications; (2) she was Daniels' only treating provider to submit requests to prescribe Gabapentin; and (3) Daniels' claim is actually against Dr. Medved, a different medical provider initially identified by Daniels. In response, Daniels contends that there is ample evidence of record establishing Dr. Mandalaywala's personal involvement in the

alleged violation, and that any questions of fact in this regard should be left to the jury.  Dkt. No. 72 at 32-33.

Daniels has raised a genuine dispute of material fact as to Dr. Mandalaywala's personal involvement in the alleged deliberate indifference, for purposes of defeating summary judgment. As an initial matter, a reasonable juror could conclude that Dr. Mandalaywala discontinued Daniel's prescriptions upon intake to Franklin C.F.  Dr. Mandalaywala does not deny that she discontinued the prescriptions for purposes of this motion, nor does she deny that the notations to "DC" medications appearing in the margin of RN Clark's form are hers.[4]  Instead, Dr. Mandalaywala relies on Daniels' allegation in the initial complaint as a concession that the medication was discontinued by RN Clark.  *See* Dkt. No. 12 ¶ 327.  Daniels, however, has submitted evidence including medical records and the testimony of former DOCCS medical personnel, suggesting that nurses did not have the authority to discontinue medication, and that Dr. Mandalaywala discontinued the Gabapentin and Tylenol #3 in conjunction with her examination of Daniels on October 30, 2019.  Dkt. Nos. 66-6 at 54-55; 68-4 at 8, 14.

Dr. Mandalaywala's argument that Daniels has confused her with Dr. Medved is also unpersuasive.  As explained below, the narrow issue surviving Dr. Mandalaywala's motion for summary judgment in this action is whether she was deliberately indifferent to Daniels' serious medical condition by failing to pursue a prescription for Gabapentin for approximately twelve months after the initial denial.  Notwithstanding Daniels' initial confusion over the identity of Dr. Mandalaywala and Dr. Medved, the medical evidence of record viewed in the light most favorable to Daniels establishes that Dr. Mandalaywala examined Daniels the day after his intake into

---

[4] Dr. Mandalaywala concedes that she "made additional notes" in the "bottom right-hand corner" of RN Clark's form, but declines to confirm or deny whether the "DC" notations in the margin are hers.  Dkt. No.  57 ¶ 62.

Franklin C.F., discontinued his Gabapentin pursuant to the MWAP Policy, and immediately submitted a request to prescribe Gabapentin, which was denied.  Dr. Mandalaywala also subsequently treated Daniels on various occasions, including for chronic pain, neuropathy and radiculopathy.  It is also undisputed that she submitted a second request to prescribe Gabapentin approximately twelve months later, which Daniels contends was submitted only after the scrutiny and lawsuit surrounding the MWAP Policy.  On these facts, Daniels has raised a genuine dispute sufficient to overcome summary judgment for lack of personal involvement.

Finally, to the extent Dr. Mandalaywala argues that she was not personally involved in any deliberate indifference because she was the only provider to request a prescription for Gabapentin, her conduct surrounding these requests are the crux of Daniels' claim.  Thus, to the extent Dr. Mandalaywala concedes her involvement, summary judgment is not appropriate on this basis for lack of personal involvement.

### ii.    Objective Prong

Dr. Mandalaywala argues that Daniels cannot demonstrate that she objectively deprived him of adequate medical care in a manner that exposed Daniels to a substantial risk of harm or serious adverse consequence.  Dkt. No. 56-2 at 14-23.  Specifically, Dr. Mandalaywala contends that Daniels has not established that the treating provider's various medical regimens constituted a deprivation of reasonable care, nor has he established that any alleged inadequacy caused or was likely to cause him harm.  *Id.*  Daniels argues that he has met the objective prong for purposes of summary judgment, to the extent that the receipt of "extensive" medical care does not preclude a claim for deliberate indifference if the "gravamen of Plaintiff's problem is not addressed."  Dkt. No. 72 at 35-36.

With respect to Dr. Mandalaywala's alleged failure to pursue a prescription for Gabapentin after the denial of her initial request, Daniels has raised a genuine dispute of material fact

sufficiently serious to satisfy the objective prong of the deliberate indifference standard.  In *Allen v. Mueller*, one of several damages action commenced by a class-action member, the court grappled with nearly identical facts.  No. 23-cv-5651, 2024 WL 3090141 (S.D.N.Y. June 21, 2024).  Similar to Daniels, Allen had been prescribed Neurontin to treat his chronic pain prior to the MWAP Policy implementation in June 2017.  *Id.* at *2-3. After implementation, the defendant-medical provider submitted a request under the MWAP Policy to prescribe Neurontin to Allen, and that request was denied by the RMD.  *Id.* at *3-5. The defendant-medical provider thereafter weaned Allen off Neurontin and pursued alternative courses of treatment for Allen's pain, including alternative medication not covered by the MWAP Policy.  *Id.* at *4.  Allen complained several times about the pain he was experiencing as he was weaned off Neurontin and after.  *Id.* at 5.

In determining whether Allen could show a deprivation of care sufficiently serious to satisfy the objective prong, the court considered the defendant-medical provider's argument that she had provided Allen with "numerous other prescriptions and accommodations" to treat his pain for purposes of providing adequate care under the Eighth Amendment.  2024 WL 3090141, at *10. The court, however, concluded that this argument "misses the mark."  *Id.*  The court went on to reason:

> Even though [the defendant-medical provider] may have provided [Allen] numerous treatment alternatives to Neurontin and Lyrica, such alternative care may still have deprived Plaintiff of adequate care by creating "particular risks" that he would suffer "chronic and substantial pain" without the requested medication. Because the decision to provide Plaintiff these alternative treatments – rather than Neurontin and Lyrica – gave rise to a risk that Plaintiff would suffer chronic pain to a greater degree than he would have on those medications, the alleged deprivation of care is sufficiently serious under the objective prong of the Eighth Amendment inquiry.

*Id.* (internal citations omitted).

This Court reaches the same conclusion with respect to Daniels' ability to establish the objective prong of the deliberate indifference inquiry. Viewing the evidence in the light most favorable to the non-moving party, Daniels suffered serious, chronic pain issues and the Gabapentin had, to a disputed-degree, helped alleviate that pain and assisted in his mobility. To the extent Dr. Mandalaywala initially sought to continue Daniels' Gabapentin regimen to address his chronic pain, she arguably observed some benefit to maintaining him on this medication. Thus, a reasonable jury could conclude that the decision to provide Daniels alternative treatments to Gabapentin created particular risks that he would suffer chronic and substantial pain without the requested medication, and deprived him of adequate care. Accordingly, summary judgment is not warranted on this basis.

### iii.    Subjective Prong

Dr. Mandalaywala argues that Daniels cannot establish that she acted with criminal recklessness when she provided "innumerable treatments" to him "in a trial and error approach" to treat his complaints of pain. Dkt. No. 56-2 at 23-32. Daniels contends that there remain questions of fact about Dr. Mandalaywala's state of mind, rendering summary judgment improper. Dkt. No. 72 at 37-38.

The parties agree that in order to establish liability for deliberate indifference Daniels would have to prove that in failing to pursue a prescription for Gabapentin, Dr. Mandalaywala "consciously ch[ose] an easier and less efficacious treatment plan" to address Daniels' chronic pain, in disregard to an excessive risk to his health. *Wright v. Martin*, No. 23-7762, 2025 WL 1091221, at *3 (2d Cir. Apr. 8, 2025) (quoting *Chance*, 143 F.3d at 703). To the extent Dr. Mandalaywala argues that there is no evidence she knew Gabapentin was an effective treatment, a reasonable jury could disagree. Viewing the facts in the light most favorable to Daniels, Dr. Mandalaywala reviewed Plaintiff's medical records upon his intake to Franklin C.F., initially

sought a prescription for Gabapentin after determining that it had been an effective medication for treating Daniel's chronic pain, and then made a second request to prescribe Gabapentin under circumstances suggesting it would be easier to obtain.

Dr. Mandalaywala also argues that after her initial request to prescribe Gabapentin pursuant to the MWAP Policy was denied, she lacked any authority to otherwise provide Gabapentin to Plaintiff, and thus cannot be found to have consciously chosen an easier and less efficacious treatment plan. In support of this contention, Dr. Mandalaywala has submitted sworn statements that she was not permitted to prescribe any MWAP medications without an approval from an RMD, that she was not aware of any appeal procedure under the MWAP Policy to challenge an RMD's denial of a medication, and that she was "not aware of any way in which [she] could obtain an MWAP medication once an RMD denied an MWAP request." Dkt. No. 56 ¶¶ 37-40.

In opposition to Defendant's argument, Daniels has offered evidence of testimony from former DOCCS medical officials – including the RMD who is alleged to have denied Dr. Mandalaywala's request to prescribe Gabapentin – suggesting that the pursuit of a medication under the MWAP Policy was not categorically precluded upon receipt of the RMD's initial denial. Dkt. No. 72 at 37-38. This includes a provider's ability to submit a new form and/or provide additional evidence to substantiate the request, call an RMD or write back with additional information that would support the need for a prescription, or even seek approval directly from the Chief Medical Officer. Dkt. No. 64 ¶¶ 8, 11, 12. There is also evidence that the RMD who denied Dr. Mandalaywala's request "invited informal conversations with treating providers to discuss the circumstances of a denial of an MWAP request." *Id.* at 13. Finally, Daniels contends that "nothing in the MWAP Policy prohibited a treating provider from submitting another MWAP request that was previously denied at any time," in particular in February 2020, when Dr. Mandalaywala

reviewed an emergency physician's recommendation for adding Gabapentin to Plaintiff's pain regiment.  Dkt. No. 72 at 38.

As Dr. Mandalaywala points out, it is not enough for a plaintiff to show that a defendant *should have* known of the excessive risk to the plaintiff's health; the standard is subjective and requires a defendant's specific knowledge.  However, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.  On this record, a reasonable juror could conclude that there were available alternative pathways for Dr. Mandalaywala to get approval for the Gabapentin that were obvious or otherwise must have been known by her, but she disregarded those options.  *See Vega*, 963 F.3d at 273 ("We have observed that "[e]vidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk.").  At minimum, Dr. Mandalaywala's second request for Gabapentin, which she contends was made after a 12-month trial-and-error approach to addressing Daniels' pain, evidences knowledge that she could submit a follow-up request, notwithstanding the RMD's initial denial.  Accordingly, summary judgment is not warranted on this basis.

For the sake of clarity, Daniels has not established a genuine dispute of material fact, and is not entitled to a jury trial, with respect to aspects of Dr. Mandalaywala's treatment not related to her failure to pursue a prescription for Gabapentin.  Specifically, no reasonable jury could conclude on this record that Dr. Mandalaywala deprived Daniels of adequate medical care by discontinuing and/or failing to represcribe his prescription for Tylenol #3 in deliberate indifference to his medical needs.  Daniels concedes that he was initially prescribed Tylenol #3 prior to his

intake at Franklin C.F., "to treat the pain from his hand crush injury."  Dkt. No. 64 ¶¶ 55, 57.   It

is undisputed that Dr. Mandalaywala did not submit a request to continue Daniels' Tylenol #3

under the MWAP Policy, but instead determined that Ibuprofen and Tylenol were appropriate

alternatives to treat Daniels' hand pain, and that they were safer options because they have less

serious side effects.  *Id.* ¶¶ 102-05.  On these undisputed facts, any disagreement Daniels has with

Dr. Mandalaywala's determination not to prescribe Tylenol # 3 is not actionable under the Eighth

Amendment.  *See Washington v. Westchester Cty. Dep't of Corr.*, No. 13 Civ. 5322, 2014 WL

1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("The law is clear that the medication a doctor selects to

treat the patient's conditions is a medical judgment and does not rise to the level of deliberate

indifference."); *Adams v. Smith*, No. 9:15-cv-913 (BKS/DJS), 2018 WL 1363495, at *4 (N.D.N.Y.

Mar. 16, 2018) ("Courts have repeatedly rejected medical indifference claims based upon a failure

to provide stronger pain medication.") (collecting cases).  Daniels concedes that he "makes no

claim for the discontinuation of Tylenol #3, as it was not administered to treat his neuropathy."

Dkt. No. 64 ¶ 49.  Accordingly, Dr. Mandalaywala's motion for summary judgment is granted as

to any claim of of deliberate indifference concerning the discontinuation of Tylenol #3.

### iv.    Qualified Immunity

Dr. Mandalaywala argues that she is entitled to qualified immunity because Daniels' rights

were not clearly established at the time of the alleged violation, and even if they were her conduct

was objectively reasonable.  Dkt. No. 56-2 at 33-37.  Daniels contends that, when considering the

relevant right, disputed facts preclude a finding of qualified immunity at this juncture.  Dkt. No.

72 at 39.

The parties dispute the particular right clearly established by law as applicable to this case.

As the *Allen* court cogently explained, the particular right at issue here is "the right to be free from

a physician's deliberate indifference to his medical needs through 'consciously choos[ing] an

19

easier and less efficacious treatment plan.'" 2024 WL 3090141 at *17 (citing *Chance*, 143 F.3d at 703). "The Court of Appeals not only articulated this right in *Chance v. Armstrong* but reaffirmed in *Brock* that it is a right protected by the Eighth Amendment." *Id.* (citing *Brock*, 315 F.3d at 167). Because there remains a genuine dispute of material fact as to whether Dr. Mandalaywala consciously chose an easier, less efficacious treatment plan subsequent to the RMD's denial of her request to prescribe Gabapentin, the Court cannot conclude as a matter of law that she did not violate a clearly established right. These factual disputes also preclude a finding that Dr. Mandalaywala's conduct was objectively reasonable as a matter of law. Viewing the facts in the light most favorable to Daniels, a reasonable juror could conclude that Dr. Mandalaywala's failure to resubmit, or otherwise pursue, the request for Gabapentin until twelve months later was not objectively reasonable. Accordingly, summary judgment is not warranted on this basis.

### 3.    *Daubert* Motion

Dr. Mandalaywala seeks to preclude the report and testimony of Daniels' expert, Dr. Adam Carinci. Dkt. No. 56-2 at 37-41. Dr. Mandalaywala contends that Dr. Carinci's opinion is "irrelevant, unreliable, and presents a real risk of prejudice because he was not provided with key evidence in forming his opinions . . . and he never opined on the specific actions undertaken by [Dr. Mandalaywala] in this case." *Id.* Dr. Mandalaywala further takes issue with the lack of reference to Dr. Mandalaywala and/or his care of Daniels in Dr. Carinci's expert report, and Daniels' attempts to cure these deficiencies by submitting improper "rebuttal" or "supplemental" reports rendering opinions specific to Dr. Mandalaywala's conduct. *Id.*

Although both Dr. Mandalaywala and Daniels refer to Dr. Carinci in their motion papers, summary judgment is not warranted on Daniel's deliberate indifference claim surrounding Dr. Mandalaywala's alleged failure to pursue a prescription for Gabapentin due to remaining factual

disputes and irrespective of the admissibility of Dr. Carinci's opinion. Accordingly, it is not necessary to reach Dr. Mandalaywala's request at this juncture. *See e.g.*, *Sec. & Exch. Comm'n v. AT&T, Inc.*, 626 F. Supp. 3d 703, 741 (S.D.N.Y. 2022) (explaining, "[t]he Court's assessment of the lay evidence . . . makes it unnecessary to resolve the *Daubert* motions at the summary judgment stage" where there was both "sufficient lay evidence as to each element for the [the plaintiff's] claim to reach a jury" and "sufficient lay evidence on which a jury could find for the defendants" and denying the parties' motions "without prejudice to either side's right to move anew under *Daubert* should the case approach trial."); *Burdick v. Kurilovitch*, No. 5:14-cv-1254 (BKS/TWD), 2017 WL 11500491, at *8 (N.D.N.Y. June 16, 2017) (denying the defendants' motion to preclude testimony from plaintiff's expert witness "without prejudice to renewal prior to trial."), *aff'd*, 792 F. App'x 868 (2d Cir. 2019); *Doe No. 1 v. Putnam Cnty.*, No. 7:16-cv-08191, 2020 WL 7027596, at *9 (S.D.N.Y. Nov. 30, 2020) ("With respect to the NYSOAG's motion to preclude the expert testimony and opinions of Dr. English, where a court determines that consideration of an expert's testimony in support of or opposition to a motion for summary judgment is unnecessary to the determination of the summary judgment motion itself, it may deny the motion to preclude without prejudice.") (citations omitted).

Accordingly, and to the extent this Court's decision has clarified the deliberate indifference claim that will proceed to trial in this action, Dr. Mandalaywala's motion to preclude expert testimony and opinion is denied without prejudice to renewal as a motion in limine.

### B.    Plaintiff Todd Briglin[5]

#### 1.    Facts[6]

Briglin was an incarcerated individual in DOCCS custody from 2013 to 2015.  Dkt. No. 87 ¶¶ 2-3.  He was treated for a variety of health issues, including chronic pain, neuropathy, degenerative disc disease, groin problems, spinal stenosis, sacroiliitis, neuralgia with neuritis, pudendal nerve entrapment, lumbar disc herniation, and chronic radiculopathy.  *Id.* at ¶¶ 26-27.  In 2014, Plaintiff began a prescription for Neurontin.  *Id.* at ¶ 33.  Medical records suggest that after Briglin complained of nausea with increases in his Neurontin dose, his medical provider discontinued it.  *Id.* at ¶ 39.

In 2015, Briglin was hit by a car.  Dkt. No. 87 ¶ 47.  In 2016, after his release from DOCCS custody, Briglin sustained injuries in a slip and fall accident.  *Id.* at ¶ 48.  Following these accidents, Briglin was prescribed several medications for headaches and neuropathic pain, including Gabapentin.  *Id.* at ¶¶ 49-54.  Medical records indicate that Briglin experienced nausea, along with other side effects, on the Gabapentin.  *Id.* at ¶ 53.  It was initially recommended that he continue taking the Gabapentin at a lower dosage, however Briglin's prescription was ultimately discontinued by his pain management physician.  *Id.* at ¶¶ 54-55.  Briglin continued to be treated with alternative medications, including Lyrica, Omeprazole, and Amitriptyline.  *Id.* at ¶¶ 56-58.  He stopped taking Lyrica in approximately 2018, due to insurance coverage issues, and apparently resumed treatment with Gabapentin.  *Id.* at ¶¶ 67-69.  Medical records indicate that the Gabapentin

---

[5] All references to docket entries in this section refer to those filed in *Briglin v. Cahill*, Case No. 9:23-cv-1001 (N.D.N.Y.), unless otherwise noted.

[6]  The facts are drawn from the parties' submissions, including Dr. Cahill's Statement of Material Facts, Dkt. No. 75-1, and Briglin's response to that statement, Dkt. No. 87, to the extent those facts are well-supported by pinpoint citations to the record and the exhibits the parties have submitted. Disputed facts are noted.  The facts are construed in the light most favorable to Briglin as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

caused nausea and diarrhea. *Id.* at ¶ 70. Per Briglin's request, the Gabapentin was discontinued and he was prescribed Lyrica. *Id.* at ¶¶ 71-72. Briglin continued to take Lyrica, along with a regimen of other medications, to address his chronic pain through March 2019. *Id.* at ¶¶ 74-76.

On March 12, 2019, Briglin was incarcerated at Steuben County Jail. Dkt. No. 87 ¶ 77. Upon admission, Briglin's Lyrica prescription was discontinued and he was instead prescribed, among other things, Gabapentin, Cyclobenzaprine and Amitriptyline for his pain. *Id.* at ¶ 78. He was also given a wheelchair, because the jail did not permit canes. *Id.* at ¶ 79. The Gabapentin caused Briglin nausea that sometimes interfered with his ability to eat. *Id.* at ¶ 80.

Briglin was transferred into DOCCS custody at Downstate C.F. on April 26, 2019. Dkt. No. 87 at ¶ 81. He was immediately admitted to the infirmary for gait impairment associated with spinal injuries. *Id.* Briglin's Gabapentin prescription was continued through May 3, 2019, when he was transferred to Franklin C.F. and admitted to the infirmary. *Id.* at ¶¶ 82-89. Briglin's Gabapentin prescription was discontinued at that time, by a provider other than Defendant Dr. Cahill. *Id.* at ¶¶ 93-95. He was continued on other medications he had been taking for chronic pain and neuropathy, including Cyclobenzaprine and Amitriptyline. *Id.* at ¶ 98.

The parties dispute what transpired during Dr. Cahill's first medical encounter with Briglin on May 28, 2019. Dkt. No. 87 ¶ 130. According to Dr. Cahill, he reviewed Briglin's medical history and medical intake forms prior to the examination, which records demonstrated to him that Gabapentin was not effective in treating Briglin's pain. Dkt. No. 75-1 ¶ 116. Dr. Cahill considered Briglin's past complaints of pain, even while taking Gabapentin. *Id.* at ¶¶ 119-20, 125. During their encounter, Dr. Cahill documented in detail each complaint and request that Briglin made during the appointment, which did not include a request for any specific medication. *Id.* at ¶¶ 131-35. In light of Briglin's prior complaints of side effects and significant pain while taking

Gabapentin, Dr. Cahill believed in his medical judgment that other medication was a medically appropriate alternative in treating Briglin's pain. *Id.* ¶ 151.

According to Briglin, however, Dr. Cahill did not have access to a significant portion of his medical records prior to their May 28th encounter. Dkt. No. 87 ¶ 116. On May 15, 2019 – after his prescriptions were discontinued but before to his May 28th encounter with Dr. Cahill – Briglin filed a grievance requesting to continue his pain medication, including Gabapentin and/or Lyrica,[7] as previously prescribed. Dkt. No. 88-44 at 7. Briglin further maintains that although he told Dr. Cahill "exactly everything that was wrong" with him, Dr. Cahill "never looked" at him. *Id.* Briglin maintains that he specifically "asked for his Gabapentin back." Dkt. No. 87 ¶ 116. When Briglin asked Dr. Cahill why his Gabapentin was being tapered, Dr. Cahill responded that he "wasn't allowed to prescribe it." *Id.* When Briglin asked Dr. Cahill to prescribe him Gabapentin, Dr. Cahill "refused." *Id.*

On May 29, 2019, Dr. Cahill entered a referral to evaluate whether Briglin required any additional surgeries. Dkt. No. 87 ¶ 136. Dr. Cahill also ordered a CT scan of Briglin's pelvis, an EMG test for lower extremity neuropathy, and entered orders for certain pain medication including Amitriptyline and Tylenol. *Id.* at ¶ 143.

Dr. Cahill did not examine or meet with Briglin again until November 12, 2019.[8] Dkt. No. 87 ¶ 161. In the interim, Briglin contends that he experienced ongoing pain and requested "numerous times" that his Gabapentin be represcribed, and that he filed grievances to this effect. *Id.* at ¶¶ 165-68, 176-77, 181-86. On November 12th, Dr. Cahill examined Briglin at a follow-up

---

[7] The grievance suggests that Briglin mistook Lyrica and Gabapentin to be the same medication. *See* Dkt. No. 88-44 at 7 ("Since my accident and my 7 surgeries, I have been on Lyrica (Gamapentine) [sic] for my nerves.").

[8] In June 2019, Dr. Cahill prescribed Briglin medication to address facial swelling and pain in response to a nurse's report that he broke a tooth. Dkt. No. 87 ¶¶ 159-60.

appointment for his chronic pain syndrome and neuropathy. *Id.* at ¶¶ 191-95. The parties dispute whether Briglin complained of pain to Dr. Cahill during this encounter. Dkt. Nos. 75-1 ¶ 196-201; 87 ¶¶ 196-201. Dr. Cahill noted that Briglin required "pain control."[9] Dkt. No. 76-2 at 20. Following the appointment Dr. Cahill entered a referral for an EMG and MRI, referencing Briglin's history of neuropathy and symptoms that "have not improved with medication." Dkt. No. 87 ¶¶ 198-200. Dr. Cahill retired shortly after, and did not have any additional involvement with Briglin's treatment after December 31, 2019, at the latest. *Id.* at ¶ 206. Briglin received continued treatment from other medical providers, including physical therapy and pain therapy. *Id.* at ¶¶ 207-08, 218. The parties dispute the efficacy of his subsequent treatment in DOCCS custody. *Id.* at ¶¶ 214-19. Briglin was released on parole on December 24, 2020. Dkt. No. 87 ¶ 221.

### 2. Summary Judgment Analysis

#### i. Personal Involvement

Dr. Cahill argues that Briglin's claim should be dismissed because it is based on actions taken by individuals other than Dr. Cahill. Dkt. No. 75-2 at 14-16. Specifically, Dr. Cahill argues that he did not discontinue Briglin's Gabapentin; there is "no evidence in the medical record that Briglin ever requested Gabapentin from Dr. Cahill;" and that even if Briglin did request Gabapentin, Dr. Cahill cannot be held liable for deliberate indifference based on his medical judgment that a different medication was a better option. *Id.* Briglin contends that Dr. Cahill was personally involved in the alleged deliberate indifference violations. Dkt. No. 90 at 37.

---

[9] The parties dispute whether Dr. Cahill's note refers to pain control generally, or whether it refers to pain control in conjunction with an MRI he requested. Dkt. No. 87 ¶ 201-02.

Dr. Cahill has not established that he is entitled to summary judgment for lack of personal involvement in the alleged deliberate indifference to Briglin's medical condition. Even though it is undisputed that Dr. Cahill did not discontinue Briglin's Gabapentin, there remains a genuine dispute of material fact as to whether Briglin asked Dr. Cahill to prescribe certain medication, and whether Dr. Cahill refused to prescribe medications because of the MWAP Policy limitations, as opposed to his medical judgment. Accordingly, dismissal is not warranted on this basis.

### ii.    Objective Prong

Dr. Cahill argues that Briglin cannot establish the objective prong of his deliberate indifference claim because the record demonstrates that he provided Briglin with prompt and extensive medical care for his chronic pain and neuropathy that was consistent with the standard of care. Dkt. No. 75-2 at 17-22. Dr. Cahill further argues that Briglin cannot establish that his alleged refusal to prescribe Gabapentin was likely to cause harm, due to Briglin's history of side effects and pain while taking the medication. *Id.* at 22-26. In response, Briglin contends that Dr. Cahill's provision of other medical care is not dispositive, and a question of fact remains as to whether he refused to prescribe adequate medication for an invalid purpose. Dkt. No. 90 at 38-40.

At the outset, Dr. Cahill's arguments rely in large part on material facts which remain disputed by the parties. For example, in arguing that his May 28, 2019 treatment of Briglin could not amount to a deprivation of adequate medical care, Dr. Briglin relies on the contention that "Plaintiff did not request any specific medications during this appointment, as Dr. Cahill would have noted this in the record had any request been made." Dkt. No. 75-2 at 18. Briglin, however, specifically contends that he did request to be placed back on certain medication, both in a grievance submitted days before his May 28th encounter with Dr. Cahill, and verbally at the encounter itself. Dr. Cahill also relies on the purported lack of effectiveness Briglin experienced on Gabapentin prior to his intake at Franklin C.F., and the admitted side effects he experienced on

26

this medication.  Briglin disputes this contention, faulting Dr. Cahill for cherry-picking quotes from certain medical records, noting that effective pain management may not equate to being pain-free, and citing to the record evidence suggesting that Gabapentin and Lyrica were effective in helping his pain.

In any event, the record suggests that Briglin had been consistently prescribed a regimen of Gabapentin and/or Lyrica for years prior to his intake at Franklin C.F. to treat his neuropathy and chronic pain.  Viewing the evidence in the light most favorable to Briglin, his prescription for Gabapentin was discontinued as a matter of course pursuant to the MWAP Policy.  Although Dr. Cahill did not discontinue Briglin's Gabapentin prescription, he met with Briglin shorty thereafter and professes to have conducted a "comprehensive review" of Briglin's medical history prior to their encounter.  By that time, Briglin had submitted a grievance complaining about the consequences of discontinuing his prescription medication.  Further viewing the evidence in the light most favorable to Briglin, he suffered ongoing pain and difficulty walking after his initial evaluation with Dr. Cahill.  Briglin contends that the alternative treatment regimen ordered by Dr. Cahill –that did not include Gabapentin or Lyrica – was not adequate to address his ongoing symptoms.  The record evidence establishing Briglin's chronic pain and difficulty walking as a result of the failure to prescribe these medications is sufficient to establish a genuine issue of material fact as to whether the interruption in his treatment constituted a "sufficiently serious" deprivation of adequate care. *See Chance v. Armstrong*, 143 F.3d at 702.  Accordingly, summary judgment is not warranted on this basis.

### iii.    Subjective Prong

Dr. Cahill further argues that he did not possess the requisite state of mind for deliberate indifference to Briglin's medical needs.  Specifically, he contends that his decision not to prescribe Briglin certain medication was formed by his own medical judgment, and does not give rise to

subjective deliberate indifference. Dkt. No. 75-2 at 26-32. Briglin contends that there is sufficient evidence suggesting that Dr. Cahill refused to prescribe the same medication because he could not get it due to the restrictions under the MWAP Policy, and/or that it was easier to prescribe a less efficacious treatment.

As previously discussed, "disagreements over medications . . . implicate medical judgments and not the Eighth Amendment." *Wright v. Genovese,* 694 F. Supp. 2d 137, 155 (N.D.N.Y. 2010), *aff'd,* 415 F. App'x 313 (2d Cir. 2011) (citing *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001)). The decision not to prescribe stronger pain medication does not evidence deliberate indifference. *Vail v. Lashway,* No. 9:12-cv-1245 (GTS/RFT), 2014 WL 4626490, at *14 (N.D.N.Y. Sept. 15, 2014) ("[T]he decision to choose one form of pain medication over another . . . is not indicative of deliberate indifference."); *Scott v. Perio*, No. 02-cv-578A, 2005 WL 711884, at *6 (W.D.N.Y. Mar. 25, 2005); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (finding that inmate's claim that medical providers should have prescribed stronger pain medication than Tylenol did not state deliberate indifference claim). Furthermore, "concern about prescribing narcotic pain medication, on which inmates . . . could become dependent, may inform a medical judgment about what drugs to prescribe." *Wright*, 694 F. Supp. 2d at 160.

Here, however, the issue is whether Dr. Cahill's decision not to prescribe certain pain medication was, in fact, informed by his independent medical judgment and consideration of Briglin's condition. Viewing the evidence in the light most favorable to Briglin, Dr. Cahill was aware of Briglin's longstanding history of treatment with Gabapentin and Lyrica by their first encounter on May 28, 2019. Briglin had filed a grievance requesting that his medication be represribed in order to manage his pain, and, according to Briglin, he specifically asked Dr. Cahill

to represcribe the medication. Although Dr. Cahill states in an affidavit in support of his pending motion that his decision not to prescribe Gabapentin or Lyrica to Briglin was based on his own independent medical judgment, there is nothing in the contemporaneous medical records to support that such an assessment was made. Moreover, Briglin has offered evidence suggesting that Dr. Cahill refused to prescribe this medication because of the restrictions under the MWAP Policy. Accordingly, because there is conflicting evidence as to what Dr. Cahill knew about Briglin's prior effective course of treatment, and whether the decision not to prescribe a medication under the MWAP Policy was medically justifiable or based on the improper application of a blanket policy, Dr. Cahill is not entitled to summary judgment on this basis.

### iv.    Qualified Immunity

Dr. Cahill argues that he is entitled to qualified immunity because Briglin's rights were not clearly established, and even if they were Dr. Cahill's conduct was objectively reasonable. Dkt. No. 75-2 at 33-37. Briglin contends that disputed facts preclude an award of qualified immunity when considering the relevant right. Dkt. No. 90 at 41.

As previously discussed, the particular right at issue in these actions is an incarcerated individual's "right to be free from a physician's deliberate indifference to his medical needs through 'consciously choos[ing] an easier and less efficacious treatment plan.'" *Allen,* 2024 WL 3090141 at *17 (citing *Chance*, 143 F.3d at 703). Because there remains a genuine dispute of material fact in this case about whether Dr. Cahill's decision not to prescribe certain medication was based on his own medical judgment or a conscious choice to pursue an easier, less efficacious treatment plan, the Court cannot conclude as a matter of law that he did not violate a clearly established right. These factual disputes also preclude a finding that Dr. Cahill's conduct was objectively reasonable as a matter of law. Accordingly, Dr. Cahill is not entitled to an award of qualified immunity at this juncture, and summary judgment is denied on this basis.

### 3.    *Daubert* **Motion**

Dr. Cahill seeks to preclude the report and testimony of Briglin's expert, also Dr. Carinci, because (1) Dr. Carinci's initial report does not provide any opinions with respect to Dr. Cahill, and (2) Dr. Carinci's report is based on insufficient data.  Dkt. No. 75-2 at 37-42.  Because Briglin has raised a genuine dispute of material fact as to the elements of his deliberate indifference claim, even without the expert report of Dr. Carinci, it is not necessary to address Dr. Cahill's *Daubert* challenges at this juncture.  *See* Section V.A.3., *supra*.  Accordingly, Dr. Cahill's motion is denied without prejudice to renewal as a motion in limine.

## VI.    CONCLUSION

For these reasons, it is

**ORDERED,** that the *Daniels* motion for summary judgment, Case No. 9:23-cv-983 at Dkt. No. 56, is **GRANTED in part and DENIED in part;** and it is further

**ORDERED,** that the *Daniels* motion for summary judgment is **GRANTED** in that Daniels' Eighth Amendment deliberate indifference claim under 42 U.S.C. § 1983 premised on Dr. Mandalaywala's alleged failure to prescribe Tylenol #3 is **DISMISSED with prejudice;** and it is further

**ORDERED,** that the *Daniels* motion for summary judgment is in all other respects **DENIED;** and it is further

**ORDERED,** that the *Daniels* motion to preclude Dr. Carinci's testimony and report, Case No. 9:23-cv-983 at Dkt. No. 56, is **DENIED** with leave to renew as a motion in limine; and it is further

**ORDERED,** that the *Briglin* motion for summary judgment, Case No. 9:23-cv-1001 at Dkt. No. 75, is **DENIED,** and it is further

**ORDERED,** that the *Briglin* motion to preclude Dr. Carinci's testimony and report, Case

No. 9:23-cv-1001 at Dkt. No. 75, is **DENIED** with leave to renew as a motion in limine.

**IT IS SO ORDERED.**

Dated: March 2, 2026

_____
Elizabeth C. Coombe
U.S. District Judge